| | |
|---|---|
| DLA PIPER US LLP | Hearing Date: October 5, 2006 |
| 1251 Avenue of the Americas | Time: 9:00 a.m. |
| New York, NY 10020 | |
| Tel. (212) 335-4500 | |
| Fax: (212) 335-4501 | |
| Thomas R. Califano (TC-5283) | |
| John P. McNicholas (JM-0694) | |

Proposed Attorneys Official Committee of Unsecured Creditors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re:                                                     :
                                                           :     Chapter 11
SOURCE ENTERPRISES, INC.,                                  :
                                                           :     Case No. 06-11707 (AJG)
                         Debtor.                           :
-------------------------------------------------------------X

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
LIMITED OBJECTION TO DEBTOR'S SECOND AMENDED APPLICATION FOR
INTERIM ORDER AUTHORIZING POST-PETITION SECURED FINANCING**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") by and through its proposed counsel, DLA Piper US LLP ("<u>DLA Piper</u>"), as and for its Objection (the "<u>Objection</u>") to the Second Amended Application of Source Enterprises, Inc., debtor and debtor in possession (the "Debtor") for Interim and Final Financing Orders Authorizing Post-Petition Secured Financing (the "Application")[1], respectfully represents:

---

[1] The proposed financier of the post-petition financing sought is Black Enterprise/Greenwich Street Growth Partners, L.L.P. (BE/GS"), an insider of the Debtor.

The Application, although not styled as such, also seeks the Court's approval of the Debtor's use of Textron Financial Corporation's ("Textron(`s)") cash collateral. Textron is the agent under the Debtor's prepetition lending facility. The Application is filed on the heels of two previously filed debtor in possession financing motions. The instant Motion now has an Interim Order and financing documents attached.

## I. BACKGROUND

1. On July 27, 2006 (the "Petition Date"), three (3) of the Debtor's creditors of Source Enterprises, Inc. ("Enterprises" or the "Debtor") filed an involuntary petition (the "Involuntary Petition") against the Debtor pursuant to section 303 of chapter 7 of title 11 of the United States Code (the "Bankruptcy Code").

2. On August 21, 2006, the Debtor moved the Court for an order converting the involuntary chapter 7 case commenced by the Involuntary Petition to a case under chapter 11 of the Bankruptcy Code (the "Conversion Motion"). At a hearing on the Conversion Motion held on September 20, 2006, the Bankruptcy Court granted the relief sought in the Conversion Motion and on September 21, 2006 entered an order converting the Debtor's involuntary chapter 7 case to a case under chapter 11 of the Bankruptcy Code.

3. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is continuing in possession of its property and is operating and managing its business as a debtor-in-possession. No trustee has been appointed.

4. On September 26, 2006, pursuant to section 1102 of the Bankruptcy Code, the United States Trustee appointed the Official Committee of Unsecured Creditors . The members the Committee are as follows: Quebecor World (USA), Inc., Gould Paper Corporation and RR Donnelley & Sons, Inc.

**A.    The Debtor**

5. The Debtor is engaged in the publishing business, including the publication of the monthly magazine <u>The Source</u> and, from time to time <u>The Source Latino</u>.

6. According to the Application, the holders of equity in the Debtor are (a) David Mays ("Mays")[2], the holder of 83.94% of the issued and outstanding voting and non-voting equity securities of the Debtor, and (b) BE/GS, the holder of 16.06% of the issued and non-voting equity securities and all of the issued and outstanding shares of the Debtor's Series A Preferred Stock.

7. BE/GS is an insider of the Debtor and is the Debtor's proposed DIP financier.

B. **Textron Financial Corporation**

8. According to the Debtor,[3] on July 31, 2002, the Debtor, together with Source Entertainment, Inc., and their subsidiaries entered into a Credit Agreement with Textron

9. Pursuant to the Credit Agreement, Textron loaned to the Debtor the aggregate principal amount of $18,000,000.00 (the "Textron Loans").

10. The Textron Loans were evidenced by the Debtor's execution of two (2) Secured Reducing Revolving Credit Notes in the aggregate principal amount of $15 million ("Note A") and $3 million ("Note B") (collectively, the "Textron Notes").

C. **The Guaranty and the Collateral**

11. The Textron Notes and the performance of all of the obligations contained in the Textron Notes and the Credit Agreement are secured by (i) Mays' right, title and interest to his 83.94% interest in the outstanding shares of the Debtor; (ii) all of the Debtor's personal property

---

[2] Mays is a chapter 7 debtor and his case is pending in the Bankruptcy Court for the District of New Jersey.

[3] The Committee has not had a meaningful opportunity to review the relevant loan documents and thus, most of the allegations set forth in sections I. A through F herein are based solely upon allegations of the Debtor and are not binding on the Committee, which reserves all rights.

and fixtures, including, but not limited to, all inventory and equipment, accounts, instruments, documents, chattel paper, intellectual property, and general intangibles and all additions and accessions thereto, and any and all proceeds and products thereof; and (iii) all of the Debtor's rights, title and interest in the Debtor's trademarks and copyrights, together with the goodwill of the business associated such trademarks and copyrights.

**D.     The Defaults Under the Credit Agreement**

12.     By letter, dated February 28, 2005 (the "Default Letter"), Textron notified the Debtor that it was in default under the Credit Agreement and demanded that the Debtor cure the default.

13.     By letter, dated March 21, 2005, Textron notified the Debtor that as a result of the Debtor's default and continuing default, the entire principal amount of the Loans, as evidenced by the Notes and the other loan documents, including interest thereon and all other fees and charges payable to Textron in connection therewith, was immediately due and payable.

14.     On March 31, 2005, Textron received a partial payment of the Debtor's obligations in the amount of $404,364.27. By letter, dated April 1, 2005, Textron acknowledged receipt of the partial payment but advised the Debtor that the payment was applied to the past due interest on the Notes and further advised the Debtor that the partial payment did not cure the Debtor's default and was not to be construed as a modification or relinquishment of the acceleration of the Loans.

15.     As of the Petition Date, the aggregate unpaid principal balance and accrued interest on all advances made to the Debtor by Textron was $15,882,930.56, plus additional amounts as provided for in the Credit Agreement.

16. As set forth above, BE/GS is a preferred shareholder of the Debtor and one of the Debtor's investors. In accordance with the terms of the investment in the Debtor made by BE/GS, the Debtor amended its Certificate of Incorporation to allow BE/GS, in the event that the Debtor defaulted on the Textron Loan, to enlarge the Debtor's board of directors and elect a sufficient number of directors to fill the vacancies of the newly enlarged board to give BE/GS the majority.

17. Following the Debtor's default on the Textron Loan, BE/GS exercised its rights under the Debtor's Certificate of Incorporation, expanded Board representation from five (5) directors to seven (7) directors and elected four (4) directors of the seven (7) directors. The BR/GS directors are Messrs. Ed A. Williams, Jeffrey Scott, Earl Graves, Jr. and Ivan Hopkins, all of whom unanimously voted to remove Mays and Scott.

18. As set forth above, BE/GS is an insider of the Debtor and is the Debtor's proposed DIP Financier.

E. **The Debtor's Alleged Current Financial Condition**

19. The Debtor has alleged that on the Petition Date, its assets consisted of equity interests in the Debtor's subsidiaries and affiliates, all properties and assets used in connection with its ownership of a publishing business, equipment, accounts, bank deposits, general intangibles, accounts receivable, documents of title, inventory, etc. The alleged approximate value of the Debtor's assets on the Petition Date was approximately $9,000,000.00 against liabilities of approximately $50,000,000.00.

20. Hence, assuming that Textron is secured by all of the Debtor's assets and those assets are worth $9 million, Textron is grossly undersecured.

## II. THE APPLICATION

21. On October 2, 2006, the Debtor filed the instant Application, pursuant to section 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c):

> (a) authorizing and approving the Debtor to enter into a $3 million DIP Credit Facility with BE/GS secured by liens on property of the Debtor's estate pursuant to section 364(c) (2) and 364(d) of the Bankruptcy Code and a super-priority administrative expense claim pursuant to section 364(c)(1), all pursuant to certain DIP Financing Documents;
>
> (b) authorizing the Debtor to enter into and comply in all respects with the DIP Financing Documents;
>
> (c) granting BE/GS super-priority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all obligations, subject to the terms and conditions contained in the Interim Order.

22. The Application also purports to seek the Court's authorization for the Debtor to use Textron's cash collateral. According to the Application, the Debtor seeks to use Textron's cash collateral generated from its operations during the period commencing on the conversion of the involuntary chapter 7 case to a chapter 11 case until the date on which the final financing Order becomes final and non-appealable. The Debtor alleges that the cash collateral will be used by the Debtor to make such essential payments, such as employee salaries, payroll, taxes, the purchase of goods, materials and other general corporate and working capital purposes in the ordinary course of Debtor's business.

## III. THE OBJECTIONS

23. The DIP Financing documents in connection with the Application and the proposed interim order were received by Debtor's counsel late in the day on Monday of this week. The Committee has also only recently retained accountants. Thus, the Committee has only been permitted a limited review of the DIP Financing documents and Interim Order.

24. In fact, there are still many documents which the Committee has requested from the Debtor which are needed for the Committee to make an informed decision on whether the Court should approve the DIP Financing on a final basis.

25. Nevertheless, it appears as though the Debtor does need an infusion of cash to sustain its operations on an interim basis.[4] Hence, the Committee supports the DIP Financing subject to the objections below, on an interim basis subject to all related issues the DIP Financing being fully vetted prior to the final hearing on the proposed DIP Financing (the "Final Hearing").

26. Notwithstanding the Committee's recognition that the Debtor needs an immediate infusion of cash to sustain its operation, the Committee is particularly concerned that the DIP Financing is being provided by BE/GS, an insider of the Debtor. While bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, courts recognize, however, that transactions between a debtor and an insider, are subject to greater scrutiny than "arms-length" transactions. See In re C.E.N., Inc., 86 B.R. 303, 306 (Bankr. D. Me. 1988); In re Zerodec Mega Corp., 39 B.R. 932, 935 (Bankr. E.D. Pa. 1984).

27. Here, since BE/GS is currently in control of the Debtor, and was in control prepetition, all the transactions between it and the Debtor must of necessity be carefully scrutinized. Accordingly, while the Committee supports interim financing to the extent necessary to keep the Debtor's business operating through a final hearing, the Committee needs

---

[4] It is not clear to the Committee that the Debtor needs as much financing as it had sought and the Committee reserves the right to raise that issue at the final DIP hearing after the Committee's accountants have had sufficient opportunity to review the Debtor's budget.

access to the information to fully analyze the transaction between the Debtor and BE/GS prior to the final hearing.

28. Given the foregoing, the Committee requests that the Court approve the DIP Financing on an interim basis in an amount necessary for the Debtor to meet its essential obligations of rent, utilities and salaries. The Committee reserves all rights with respect to objections to final approval of the DIP Financing, including an objection to the source of funding. At this juncture, the Committee has the following initial concerns with respect to the proposed DIP financing:

    (a) While the Debtor seeks to borrow $500,000 for the Interim period and $3,000,000 overall; the budget submitted appears to show a need of only $175,000 on an interim basis and $575,000 overall.

    (b) It is difficult to assess the need for funding absent verification of the Debtor's original cash position.

    (c) While the Debtor states that it is in arrears of $640,000 with respect to prepetition payroll taxes the budget does not reflect payment of such taxes, postpetition.

    (d) the Debtor gives no indication as to whether the proposal financial covenants in the DIP Financing documents are realistic or achievable.

### IV. CASH COLLATERAL STIPULATION

29. With regard to the Debtor's proposed usage of Textron's cash collateral ("Cash Collateral")[5], the Cash Collateral Order:

    (a) provides that post-petition interest accrues on the Debtor's prepetition credit facility with Textron, however, those interest

---

[5] The Debtor has circulated a proposed order granting Textron adequate protection and authorizing the Debtor's use of Textron's Cash Collateral (the "Cash Collateral Order").

amounts are subject to disallowance if Textron is "deemed unsecured." In this case, Textron appears to be unsecured and is not entitled to interest. Subjecting the accrued amounts to disallowance improperly shifts the burden of proving Textron's secured or unsecured status to the Committee;

(b)     should provide that any replacement lien granted to Textron is only as valid as existing prepetition liens;

(c)     the term "Carve Out" is not defined, nor the scope of the Carve Out described; and

(d)     contains an unrealistic and unacceptable Termination Event if the Debtor fails to file a plan and disclosure statement acceptable to Textron by October 16, 2006.

30.     Subject to the foregoing objections, the Committee supports the DIP Financing on an interim basis. The Committee respectfully reserves all of its rights to object to all aspects of the DIP Financing at the Final Hearing and any interim order entered should provide for same.

**WHEREFORE**, the Committee respectfully requests that the Court provide relief consistent with the objections provided herein, and that the Court grant such other and further relief as it deems just and proper.

Dated:  New York, New York
        October 4, 2006

**DLA PIPER US LLP**

By: */s/ Thomas R. Califano*
    Thomas R. Califano (TC-5283)
    1251 Avenue of the Americas
    New York, NY 10020
    Tel. (212) 335-4500
    Fax (212) 335-4501

    Proposed Attorneys Official Committee of Unsecured Creditors