UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re                                                      :      Chapter 11
                                                           :
SOURCE ENTERPRISES, INC., *et al.*,                        :      Case No. 06-11707 (AJG)
                                                           :      (Jointly Administered)
                              Debtors.                     :
                                                           :
-----------------------------------------------------------------x

## OPINION REGARDING AMENDED APPLICATION OF WINDELS MARX LANE & MITTENDORF, LLP FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES

A P P E A R A N C E S

WINDELS MARX LANE & MITTENDORF, LLP
Appearing *Pro Se*
156 West 56th Street
New York, NY 10019

> Craig P. Murphy, Esq.
> Regina Griffin, Esq.
>        Of Counsel

CURTIS, MALLET-PROVOST, COLT & MOSLE, LLP
Attorneys for Debtors
101 Park Avenue
New York, NY 10178

> Lynn P. Harrison 3rd, Esq.
> Turner P. Smith, Esq.
> Jerrold L. Bregman, Esq.
>        Of Counsel

SKADDEN, ARPS, SLATE, MEAGHER & FLOM
Attorneys for Black Enterprise/Greenwich Street Corporate Growth Partners, L.P.
Four Times Square
New York, NY 10036

> Eric M. Davis, Esq.
> J. Gregory St. Clair, Esq.
>        Of Counsel

DIANA G. ADAMS
UNITED STATES TRUSTEE
33 Whitehall Street, 21st Floor
New York, NY 10004

      Richard C. Morrissey, Esq.
        Of Counsel

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

      Before the Court is an application (the "Amended Fee Application") by the law

firm of Windels Marx Lane & Mittendorf, LLP ("Windels") seeking payment of fees and

reimbursement of expenses in connection with its representation of Source Enterprises,

Inc. ("Enterprises" or "Debtor").  A hearing on the Amended Fee Application was held

on November 28, 29 and December 10, 2007 (the "Fee Hearing").

      Windels represented Enterprises for approximately five months of this case

beginning September 20, 2006 (the "Retention Date") and ending February 1, 2007, the

date Windels withdrew based on alleged non-payment of fees (the "Withdrawal Date").

In the Amended Fee Application, the firm seeks fees in the amount of $526,355.50 and

expenses of $31,175.09 (totaling $557,530.59) incurred between July 27, 2006 (the

"Involuntary Petition Date") and April 27, 2007, approximately three months following

the Withdrawal Date.[1]

      According to Charles E. Simpson, Esq. ("Simpson"), the Windels partner in

---

[1] The Amended Fee Application revises an initial fee application, dated March 28, 2007, wherein Windels sought fees of $511,825.50 and expenses of $30,613.14 (totaling $542,438.64) for the period July 27, 2006 through February 28, 2007 (the "Initial Fee Application").

2

charge of the representation, the Initial Fee Application was amended in order to add

approximately $15,000 for legal services performed for a non-debtor affiliate, Source

Entertainment, Inc. ("Entertainment"), during Windels's tenure as bankruptcy counsel to

Enterprises.  Simpson contends that the Court's confirmation of the Fourth Amended

Plan of Reorganization (the "Plan"), which substantively consolidated Enterprises with

its affiliates, entitles Windels to include in the Amended Fee Application, compensation

for services rendered to Entertainment.[2]

While Simpson is correct that the Court substantively consolidated Enterprises

with its affiliates (and did so over the objection of Windels), the consolidation was

effective October 31, 2007 – the effective date of the Plan – and not, as Simpson asserts,

as of the Involuntary Petition Date.[3]  There is simply no legal support for the proposition

that legal services provided to a non-debtor affiliate (not within the scope of a retention),

while serving as bankruptcy counsel to a debtor, warrant administrative expense status

upon a subsequent substantive consolidation.

Objections to the Amended Fee Application were filed by Black

Enterprise/Greenwich Street Corporate Growth Partners, L.P. ("BEGS"),[4] the

---

[2] At the Fee Hearing, Simpson was asked to describe the additional fees and expenses sought: "Q: Can you tell the Court [why] you filed the Amended Fee Application?  A: At the confirmation hearing . . . the Court made a ruling that Enterprises, Entertainment and all the magazine and the 19 other [pseudonymous] entities were, in fact, one business, one entity.  As a result, I believe that based on that decision the services rendered to Entertainment from the date of the Enterprise petition through the date that [Windels] withdrew, were entitled to treatment as an administrative expense incurred on behalf of that debtor because, as I understood it, while the petition was filed in April, the effective date of the petition is the date of the first petition that was filed."  (Fee Hr'g Tr. vol. 2, 40, Nov. 29, 2007).

[3] (Confirmation Order 18; Notice of Occurrence of Effective Date 1).

[4] BEGS is a private equity investment fund that invested in, and held preferred shares of, . . .

Debtors,[5] and the United States Trustee (the "UST") arguing that Windels was not

qualified to act as bankruptcy counsel to Enterprises because it was not "disinterested"

and held an interest adverse to the estate in contravention of section 327 of the

Bankruptcy Code.  Additionally, they argue that Windels's failure to disclose these and

other relevant connections constitutes a breach of Federal Rule of Bankruptcy Procedure

2014 ("Bankruptcy Rule 2014").[6]

Based on the pleading as filed, the Fee Hearing, the balance of the record in this

case and the reasons set forth herein, the Court finds that Windels was a creditor of

Enterprises when it sought to be retained and, as a result, was not "disinterested" and

therefore not qualified to serve as bankruptcy counsel.  Further, Windels failed to

disclose its creditor status and other important connections relevant to the determination

of its suitability to be retained.  Finally, Windels breached its ethical, professional

obligations by failing to adequately represent the Debtor and these failures harmed the

estate.

_____

Entertainment and Enterprises.

[5] The Debtors means, collectively, Enterprises, Entertainment and Source Magazine, LLC ("Magazine"), and each of the following entities and pseudonyms by which any of them have been known and/or have done business, including: Source Entertainment, LLC; Source Holdings LLC; Source Merchandising LLC; The Source.com, LLC; Source Sound Lab, LLC; Source Music, LLC; Source Broadcast Media, LLC; The Source; Source Publications, Inc.; Source Magazine; The Source Magazine; The Source Awards; Hip-Hop Hits; Source Sports; Unsigned Hype LLC; and Source Media and Merchandising, Inc.

[6] In addition to objecting based upon a lack of disinterestedness and a failure to adequately disclose, BEGS, the Debtors, and the UST argue that Windels should not be compensated for services that did not benefit the estate, services rendered before the Retention Date, or services rendered after the Withdrawal Date.

## I.  BACKGROUND

The following facts have been set forth in testimony as well as in various

documents and pleadings filed in the case.

### A.  *The Business*

Enterprises, originally named Source Publications, Inc., was founded by David

Mays ("Mays") in October 1989.  Enterprises publishes a monthly magazine titled *The*

*Source* ("The Source") and on occasion, a magazine titled *The Source Latino*.  The

magazine contains articles, interviews, promotions, and advertisements pertaining to the

"hip hop" music industry as well as popular culture and politics.  Enterprises, as well as

its subsidiaries (collectively, the "Source Entities"), license trademarks, trade names, and

service marks for use in connection with (i) the licensing and promotion of audio and

video programming, (ii) Source-branded DVD and CD products, and (iii) the sale of

products, including "ring tones" and "wallpaper" for mobile telephones and computers.

The Source Entities have produced hip-hop music-related and promotional events,

including the awards show, *The Source Awards*.  At its zenith in 2002, approximately

500,000 issues of The Source were circulated monthly.

Mays held one hundred percent of the equity securities of Enterprises and

Entertainment.  In April 2002, BEGS invested $12 million in the Source Entities in

exchange for preferred shares of Enterprises and Entertainment.

### B.  *Textron*

In July 2002, Textron Financial Corporation ("Textron") loaned the Source

Entities approximately $18,000,000 (the "Textron Loan") pursuant to a credit agreement

(the "Credit Agreement").  The parties to the Credit Agreement were Textron, as the

lender, and Enterprises, Entertainment, Magazine, Source Entertainment, LLC, Source

Holdings LLC, Source Merchandising LLC, The Source.com, LLC, Source Sound Lab,

LLC, Source Music, LLC, and Source Broadcast Media, LLC, as the borrowers (the

"Borrowers").  The Borrowers executed two notes; one for $15 million and the other for

$3 million (the "Notes").  (Textron Compl. ¶¶ 1-15).

As collateral for the Borrowers' obligations to Textron, (i) Mays personally

guaranteed the Borrowers' performance of the Textron Loan and pledged his equity

securities in Enterprises and Entertainment as collateral; (ii) the Borrowers, pursuant to a

Securities Pledge Agreement, pledged all of their property, including, but not limited to,

inventory and equipment, accounts, intellectual property, intangibles and any and all

proceeds and products thereof; and (iii) Enterprises and Magazine executed a Trademark

and Copyright Security Agreement pledging their rights in trademarks and copyrights

and the goodwill associated therewith.  (Discl. Stmnt. 10-11; Textron Compl. ¶¶ 18-21).

### C.  Default

The Borrowers defaulted on the Textron Loan in early 2005 (the "Default").  On

March 31, 2005, the Borrowers made a partial payment of $404,364.27.  (Textron Compl.

¶¶ 34-37.)  As of the Involuntary Petition Date, the Borrowers owed Textron

$18,304,802.  (Discl. Stmnt. 11).

### D.  Mismanagement

In July 2005, Textron commissioned a crisis management firm to analyze the

Source Entities's business.  Morris-Anderson & Associates, Ltd. prepared a draft report

(the "Morris Report"), that found that Mays and Raymond "Benzino" Scott ("Scott"), the

Chief Brand Manager, grossly mismanaged the Source Entities.  Among other things, the

6

Morris Report found that one or more of the Source Entities issued checks to contractors and third party vendors from deposit accounts with insufficient funds to cover the amounts of the checks; there were no internal controls governing the issuance of checks and wire transfers; approximately fourteen "no-show" employees were paid salaries; and the Source Entities transferred assets to and for the benefit of Mays, Scott and other insiders without documentation or legitimate business purpose. The Morris Report also found that Mays and Scott failed to maintain the corporate status of the entities in good standing, did not close their books on a monthly basis, and did not file federal or state corporate income tax returns for 2003, 2004 and 2005.

By 2005, the Source Entities's gross revenues were less than $20 million, having decreased from $33 million in 2003 and $25.8 million in 2004. During the same period, the Source Entities's liabilities increased from $26.3 million to $29.4 million and losses totaled approximately $11.4 million. (Am. Fee Appl. ¶¶ 20-21; Discl. Stmnt. 9.) A 2006 investor report prepared by BEGS stated that in late 2004, Mays failed to mail 140,000 magazine subscriptions and had not permitted the Audit Bureau of Circulation – the magazine industry's certification organization – to audit the Source Entities, thereby reducing by 50% the amount advertisers would pay for a page in The Source. (Fee Hr'g Tr. vol 3, Ex. W-21 at 3, Dec. 10, 2007).

Concerned about the Default and its own investment in the Source Entities, BEGS retained Windels in August 2005. Ed Williams ("Williams"), a managing director of BEGS, stated that Windels was hired "to represent [BEGS] related to Source Enterprises matters" and "to advise [BEGS] on the potential restructuring of the Source and dealing with Textron." (Fee Hr'g Tr. vol. 2, 72, Nov. 29, 2007).

7

### E.  Litigation

In September 2005, Textron commenced a breach of contract action against the Borrowers and Mays seeking damages in excess of $16 million.  Textron also commenced an action to foreclose on its collateral and, at the same time, sought injunctive relief and the appointment of a temporary receiver in the Supreme Court of New York State, New York County to rectify the gross mismanagement.

In November 2005, two former female executives commenced an action in the United States District Court for the Southern District of New York against Enterprises, Entertainment, Mays and Scott alleging harassment and unlawful retaliation.[7]

On January 9, 2006, BEGS exercised its rights as a preferred shareholder and increased the size of the Enterprises and Entertainment boards and elected a majority of the directors: Williams, Jeffrey Scott ("J. Scott") and Ivan Hopkins of BEGS and Earl "Butch" Graves, Jr. of Black Enterprise Magazine.  (Am. Fee Appl. ¶ 30; Discl. Stmnt. 12.)  Prior to a January 12, 2006 board meeting, called to terminate Mays's and Scott's employment with the Source Entities, Mays and Scott commenced an action against BEGS and the individual directors challenging the right to remove them from their respective positions (the "New Jersey Action").  Windels represented BEGS and the individual directors in the New Jersey Action.

On January 18, 2006, the boards of Enterprises and Entertainment authorized J. Scott to issue termination letters to Mays and Scott.  Enterprises and Entertainment

---

[7] A judgment was entered in favor of the plaintiffs on October 31, 2006, which the defendants appealed.  The parties ultimately reached a settlement.

retained Windels on January 24, 2006.

Around the same time, Mays commenced a third-party action against BEGS and the directors asserting that neither BEGS nor the directors had the power to terminate him, and cross-claimed against certain of the Source Entities (the "Third-Party Action"). Windels represented the individual directors in the Third-Party Action.

Textron then scheduled a U.C.C. sale of Mays's equity securities (the "U.C.C. Foreclosure").  In response, Mays filed an action to enjoin the directors appointed by BEGS from being seated and to enjoin Textron from proceeding with the U.C.C. Foreclosure.  After several hearings, the Supreme Court of the State of New York authorized the U.C.C. Foreclosure sale to proceed.  Textron scheduled the U.C.C. Foreclosure sale as well as a foreclosure sale of the Borrowers' trademarks and copyrights.  On May 2, 2006, the morning of the foreclosure sales, Mays filed a chapter 7 bankruptcy petition.  Windels represented Enterprises in Mays's bankruptcy proceeding.

On July 10, 2006, the Bankruptcy Court for the District of New Jersey granted Textron's motion to lift the automatic stay in Mays's case and Textron scheduled a second U.C.C. foreclosure sale of Mays's equity securities as well as of the Borrowers' trademarks and copyrights for July 27, 2006.  On that morning, however, an involuntary petition was filed against Enterprises in this Court.

### F.  The Bankruptcy

On the Involuntary Petition Date, three creditors filed an involuntary petition for relief against Enterprises under chapter 7 of title 11 of the Bankruptcy Code (the

"Involuntary Petition").[8]

On September 21, 2006, the Court converted the involuntary to a voluntary case under chapter 11.  On September 25, 2006, an application was filed to retain Windels as Enterprises's chapter 11 attorneys (the "Retention Application") and Simpson submitted a corresponding affidavit under Bankruptcy Rule 2014 (the "2014 Affidavit").[9]  On September 26, 2006, the UST appointed the Official Committee of Unsecured Creditors (the "Committee").

Enterprises was authorized on October 13, 2006 to enter into a $3 million debtor-in-possession financing facility with BEGS.

On October 19, 2006, Windels filed a plan and disclosure statement (the "Original Plan and Disclosure Statement").  The Committee and the UST filed objections to the Original Plan and Disclosure Statement.

On October 23, 2006, the Committee filed a motion to establish procedures for compensating professionals on a monthly basis (the "Interim Comp Motion").  The Interim Comp Motion sought an order requiring Enterprises to pay professionals 80% of monthly fees and 100% of expenses, upon the submission of a monthly fee statement and a 20-day objection period.

The UST convened the first section 341 creditors meeting on November 3, 2006

---

[8] The petitioning creditors included The McMillan Firm, which Enterprises owed $530,228 for unpaid legal services.

[9] Windels had filed an earlier retention application and 2014 affidavit on August 22, 2006 seeking to be retained as counsel in the involuntary chapter 7 case that was unnecessary and, therefore, never considered by the Court.

(the "341 Meeting").

The Court granted the Interim Comp Motion on November 8, 2006 (the "Interim Comp Order). Pursuant thereto, Windels submitted fee statements to Enterprises on November 22, 2006 seeking $267,858.10; on December 7, 2006 seeking $55,179.06; and on January 12, 2007 seeking $42,808.80. BEGS paid Windels $50,000 on December 29, 2006 regarding the November and December fee statements. Counsel for the Committee, as well as its accountants, submitted fee statements that were paid in accordance with the Interim Comp Order.

On January 12, 2007, Windels filed a motion to withdraw as Enterprises's counsel based on BEGS's failure to pay Windels in accordance with the Interim Comp Order (the "Withdrawal Motion").[10] The Court granted the Withdrawal Motion on February 1, 2007 and Curtis, Mallet-Prevost Colt & Mosle LLP ("Curtis Mallet") was retained on March 7, 2007 as Enterprises bankruptcy counsel *nunc pro tunc* to January 22, 2007.

On March 15, 2007, Windels filed a proof of claim against Entertainment[11] for $542,438.64 in fees and expenses incurred as bankruptcy counsel.

On March 28, 2007, Windels filed the Initial Fee Application. It was subsequently modified by the Amended Fee Application, which is the subject of this opinion.

On April 27, 2007, Entertainment and Magazine filed voluntary petitions for

---

[10] Windels testified that there was additional "cause" for seeking withdrawal that it did not include in the Withdrawal Motion. (Fee Hr'g Tr. vol. 1, 96-100, Nov. 28, 2007).

[11] The Court assumes Windels meant Enterprises given that Entertainment was not yet a debtor.

relief under chapter 11 of the Bankruptcy Code.  The Debtors filed a motion, which the

Court granted, seeking joint administration.  The Debtors also filed a motion, which the

Court granted after notice, seeking that substantive orders entered in the Enterprises case

be deemed applicable to Entertainment and Magazine.  No objections were filed to these

motions.

On May 4, 2007, the UST filed an objection to the Initial Fee Application

arguing, among other things, that Windels's legal services did not benefit the estate.

On June 6, 2007, the Court granted the Debtors' motion[12] seeking an order

conditionally approving a disclosure statement with respect to an amended plan and

scheduling a combined hearing to consider final approval of the disclosure statement and

confirmation of the amended plan.

On June 15, 2007, the Debtors filed an amended disclosure statement with respect

to a second amended plan.

On July 13, 2007, the Committee filed a statement reserving its right to object to

the amended disclosure statement and/or confirmation of the second amended plan

pending further due diligence on the financial affairs of the Debtors.

On July 13, 2007, Windels filed a proof of claim against Entertainment in the

amount of $185,038.89 for legal services provided to Entertainment from January 6, 2006

through July 9, 2007 (the "Entertainment Proof of Claim").

On July 23, 2007, BEGS and the Debtors filed objections to the Initial Fee

---

[12] The motion was noticed to the UST, the Committee, BEGS and Textron, but not to all creditors.

Application arguing, among other things, that Windels was not a "disinterested person."

On July 23, 2007, Windels filed an objection to the Debtors' amended disclosure statement arguing, among other things, that it failed to provide adequate information. Windels also filed an adversary proceeding against Enterprises and BEGS seeking a declaratory judgment that BEGS was the alter ego of Enterprises and seeking compensatory damages of $453,948.46, plus interest. Windels dismissed this adversary proceeding upon confirmation of the Plan. The Court assumes that it was dismissed because the Plan contained a release for each of the defendants.

On July 24, 2007, the Debtors filed a supplement to the second amended plan which included projections, sources and uses of funds and disclosures about the make-up and compensation to be paid to the reorganized debtors' board and management. On July 25, 2007, the Debtors filed an augmentation of the supplement to the second amended plan that included further information as to the treatment of unsecured creditors.

On July 31, 2007, the Court determined that its prior, conditional approval of the amended disclosure statement was unwarranted because relevant information regarding valuation, third party releases and the treatment of unsecured creditors had not been provided at the time of solicitation. The Court found that the amended disclosure statement did not provide adequate information and denied the Debtors' motion for its final approval. The Court instructed the Debtors to make further amendments to the disclosure statement and, once approved, re-solicit votes thereon.

On August 3, 2007, Windels filed a motion to compel Enterprises and BEGS to pay Windels pursuant to the Interim Comp Order.

On August 15, 2007, Windels filed an adversary proceeding against BEGS,

Entertainment, and other Source Entities seeking a declaratory judgment that BEGS was the alter ego of Entertainment and the entities, and seeking compensatory damages of $116,550.43, plus interest.  Windels dismissed this adversary proceeding upon confirmation of the Plan.  The Court assumes that it was dismissed because the Plan contained a release for each of the defendants.

On August 17, 2007, the Debtors filed a further amended disclosure statement and, on August 20, 2007, a third amended plan.

On August 21, 2007, Windels filed an amendment to the Entertainment Proof of Claim removing $68,488.46 in prepetition legal fees that Enterprises owed Windels.

On August 22, 2007, the Debtors filed the Plan and an amended disclosure statement with respect to the Plan (the "Disclosure Statement").

On August 23, 2007, over Windels's objection, the Court approved the Disclosure Statement and related solicitation procedures and deadlines.

On October 1, 2007, also over Windels's objection, the Court confirmed the Plan. Windels appealed the Confirmation Order on October 11, 2007, which appeal is currently pending.  The Plan became effective on October 31, 2007.

On October 26, 2007, Windels filed the Amended Fee Application.

On November 21, 2007, the UST, BEGS and the Debtors filed supplemental objections to the Amended Fee Application arguing that Windels was not disinterested and that its legal services did not benefit the estate.

On November 27, 2007, Windels filed a response to the supplemental objections reasserting that Windels was disinterested and that its legal services conferred a benefit to the estate.

The Court held hearings on the Amended Fee Application on November 28, 29 and December 10, 2007.

## II.  LEGAL STANDARD

A determination of the Amended Fee Application under section 330(a) requires, among other things, a determination as to whether Windels, at the time of its retention, was disinterested and/or held or represented an interest adverse to the estate under section 327 of the Bankruptcy Code.

Section 327 provides that in order to be employed by a debtor, counsel may not "hold or represent an interest adverse to the estate" and must be a "disinterested person." 11 U.S.C. § 327(a).  If counsel has been employed and the court subsequently learns that during the counsel's employment he was not disinterested or held or represented an interest adverse to the estate, the court can deny compensation.  *See id.* § 328(c).

"An interest adverse to the estate," the first prong of section 327(a), is not defined by the Bankruptcy Code.  But, as one court explained, "if it is plausible that the representation of another interest may cause the debtor's attorneys to act any differently than they would without that other representation, then they have a conflict and an interest adverse to the estate." *In re Leslie Fay Cos.,* 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994).  *Collier* describes "an interest adverse to the estate" as "'any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute,' or 'a predisposition under circumstances that render such bias against the estate.'"  3 L. King, *Collier on Bankruptcy* ¶ 327.04[2][b] (15th ed. rev. 2007).

The second prong of section 327(a), that an attorney be a "disinterested person," means, as defined in section 101(14) of the Bankruptcy Code, a person that "(A) is not a

creditor," and "(C) does not have an interest materially adverse to the interest of the

estate . . . by reason of any direct or indirect relationship to, connection with or interest

in, the debtor."  11 U.S.C. § 101(14)(A), (C).

A "creditor" includes one who holds a prepetition claim against a debtor.  *Id.*

§101(10).  According to *Collier*, "it is presumed by the statute that a person who is a

creditor . . . is incapable of the impartial judgment required of a professional in the

conduct of a case under the Code."  3 L. King, *Collier on Bankruptcy* ¶ 327.04

[2][a][iii][C] (15th ed. rev. 2007).  Most courts strictly follow the Bankruptcy Code's

exclusion of creditors from disinterested-person status and hold that a professional who is

a prepetition creditor does not meet the disinterested-person requirement.  *U.S. Trustee v.*

*Price Waterhouse*, 19 F.3d 138, 141 (3d Cir. 1994); *In re Patterson*, 53 B.R. 366, 372

(Bankr. D. Neb. 1985).

A "disinterested person" – one that "does not have an interest materially adverse

to the interest of the estate" – overlaps with the first prong of section 327(a) requiring

that a professional not "hold or represent an interest adverse to the estate."  11 U.S.C. §§

101(14)(C), 327(a).  "[T]he twin requirements of disinterestedness and lack of adversity

telescope into a single hallmark."  *In re Leslie Fay Cos.,* 175 B.R. at 532 (quoting *In re*

*Martin*, 817 F.2d 175, 181 (1st Cir. 1987)); *see also In re Vebeliunas*, 231 B.R. 181, 189

(Bankr. S.D.N.Y. 1999) ("[T]hey form one hallmark with which to evaluate whether

professionals seeking court-approved retention . . . meet the absence of adversity

requirements embodied in the Bankruptcy Code.").  "An interest materially adverse to the

interest of the estate" has been described as "a 'catch-all clause,' and it seems broad

enough to include anyone who in the slightest degree might have some interest or

16

relationship that would even faintly color the independent and impartial attitude required

by the Code and Bankruptcy Rules." *In re Vebeliunas*, 231 B.R. at 191 n.10, 191-192

("To be disinterested is 'to prevent even the appearance of a conflict'" and "a disinterested

person 'should be divested of any scintilla of personal interest which might be reflected

in his decision concerning estate matters.'" (citations omitted)).

"The requirements of section 327 . . . 'serve the important policy of ensuring that

all professionals appointed pursuant to [section 327] tender undivided loyalty and

provide untainted advice and assistance in furtherance of their fiduciary

responsibilities.'" *In re Leslie Fay Cos.,* 175 B.R. at 532 (quoting *Rome v. Braunstein*,

19 F.3d 54, 58 (1st Cir. 1994)).

In furtherance of section 327, Bankruptcy Rule 2014 requires a court order

authorizing the debtor's retention of a professional pursuant to an application setting

forth, among other things, "any proposed arrangement for compensation, and, to the best

of the applicant's knowledge, all of the person's connections with the debtor, creditors,

any other party in interest . . . ." Fed. R. Bankr. P. 2014(a).  Additionally, "[t]he

application shall be accompanied by a verified statement of the person to be employed

setting forth the person's connections with the debtor, creditors, or any other party in

interest . . . ." *Id.*  The application must be filed with the court and served upon the UST.

The purpose of Bankruptcy Rule 2014 "is to provide the court (and the United

States Trustee) with information necessary to determine whether the professional's

employment meets the broad tests of being in the best interest of the estate . . . ." 9 L.

King, *Collier on Bankruptcy* ¶ 2014.03 (15th ed. rev. 2007).  "[F]ailure to disclose any

fact which may influence the court's decision may result in a later determination that

17

disclosure was inadequate and sanctions should be imposed on the professional." *Id.*

Compliance with Bankruptcy Rule 2014 is the responsibility and burden of the professional. *See In re Keene Corp.*, 205 B.R. 690, 695 (Bankr. S.D.N.Y. 1997). The term "connections" is broad and is strictly construed for purposes of Bankruptcy Rule 2014. *Balco Equities Ltd. v. Cohen, Estis and Ass'n* (*In re Balco Equities Ltd.),* 345 B.R. 87, 112 (Bankr. S.D.N.Y. 2006) ("Failure to disclose direct or indirect relations to, connections with, or interest in the debtor violate . . . [s]ection 327(a) and Bankruptcy Rule 2014."). Persons to be employed "'must disclose all facts that bear on [their] disinterestedness and cannot usurp the court's function by choosing, *ipse dixit*, which connections impact disinterestedness and which do not. The existence of an arguable conflict must be disclosed if only to be explained away . . . .'" *In re C&C Demo, Inc.*, 273 B.R. 502, 507 (Bankr. E.D. Tex. 2001) (quoting *In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998)).

Nor can the adequacy of disclosure be judged by whether other parties made inquiry. *In re Matco Electronics Group, Inc.,* No. 02-60835, 2008 WL 141908, at *5 (Bankr. N.D.N.Y. Jan. 11, 2008) (denying fees for failure to fully disclose a conflict, the court stated "2014 is not intended to condone a game of cat and mouse where the professional seeking appointment provides only enough disclosure to whet the appetite of the UST . . . or [other parties], and then the burden shifts to those entities to make inquiry in an effort to expand the disclosure."). "Coy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient." *In re Saturley*, 131 B.R. 509, 517 (Bankr. D. Me. 1991). As the *Leslie Fay* court stated, "[s]o important is the duty of disclosure that the failure to disclose relevant connections is an

18

independent basis for the disallowance of fees or even disqualification." 175 B.R. at 533.

## III. DISCUSSION

Having reviewed all of the documents and testimony and having weighed the credibility of witnesses, the Court finds that Windels is not entitled to compensation for its work as bankruptcy counsel. The circumstances extant at the time Windels was retained reveal that the firm was not disinterested and held an interest adverse to Enterprises's estate and, as such, was not qualified to represent Enterprises. The firm also failed to comply with disclosure obligations under Bankruptcy Rule 2014 and breached ethical, professional obligations in its representation of Enterprises. As a result, a denial of fees is warranted.

### A. Windels was a creditor of the Debtor

Enterprises owed Windels at least $68,488.86 (as evidenced by the amended Entertainment Proof of Claim and Windels's accounting records) when the firm sought retention as bankruptcy counsel. Windels asserts that the firm had written off any amount due from Enterprises and never intended to collect it and, as such, was disinterested and qualified to represent Enterprises. The record establishes otherwise.

Windels's relationship with Enterprises began through BEGS. A mutual acquaintance of Simpson and Williams introduced them in 2002 and they discussed Simpson's and his firm's restructuring experience. In 2005, following the Default and the Source Entities' mismanagement, BEGS contacted Windels seeking advice regarding BEGS's investment in the Source Entities. BEGS retained Windels in August 2005 to represent BEGS in gaining control of the Enterprises and Entertainment boards and bringing discipline to the Source Entities. At that point, BEGS was not only the funder

of the Source Entities' operations but two of BEGS's directors, Williams and J. Scott, sat

as directors of certain Source Entities.

Windels was eager to be retained and agreed with BEGS to a flexible billing and

payment arrangement.  Once BEGS placed its directors on the boards of Enterprises and

Entertainment, the boards authorized the retention of Windels in January 2006.  Windels

represented the Source Entities and BEGS, as necessary, in defending against various

actions, including lawsuits by former management and foreclosure actions by Textron.

(Fee Hr'g Tr. vol. 1, 5-14, Nov. 28, 2007; Fee Hr'g Tr. vol. 2, 71-73, Nov. 29, 2007; Am.

Fee Appl. ¶¶ 31-34).

Representing both BEGS and the Source Entities, Windels was intimately familiar

not only with BEGS's management and the individuals placed in control of the

Enterprises and Entertainment boards, but also of the operation of the Source Entities as a

single entity and their reliance upon BEGS for working capital needs.

When the Involuntary Petition was filed, BEGS and Windels agreed that Windels

would represent Enterprises as bankruptcy counsel.  It was contemplated that Windels

would seek to convert the case from an involuntary chapter 7 to a voluntary chapter 11

and, once converted, proceed with effectuating an already contemplated restructuring.

Three weeks after the Involuntary Petition was filed, Windels requested -- first in a

conversation with Williams and later with Williams and J. Scott -- that BEGS, as the sole

funder of Source Entities expenses, immediately pay Windels's outstanding legal bills for

work done on behalf of BEGS with regard to its investment in the Source Entities as well

for work done directly for the Source Entities.  At the time of the Involuntary Petition,

Windels was owed in excess of $480,000.  Although the parties dispute how this

20

obligation would ultimately be satisfied, it is clear under any set of facts that at the time
Windels sought the Court's authorization to be retained, it was a creditor of Enterprises.

Williams testified that Simpson's request to be immediately paid $480,000 was a
surprise to BEGS.  He testified that BEGS was unprepared for the request because it had
been relying upon the flexible billing and payment arrangement Windels had initially
agreed to.  (Fee Hr'g Tr. vol. 2, 80-81, Nov. 29, 2007.)  During the payment discussions,
J. Scott contends that Simpson offered to accept $380,000 in complete satisfaction of the
$480,000 amount due to Windels but that the offer was rejected.  According to J. Scott
and Williams, the parties agreed, instead, upon a payment of $275,000 and to discuss
satisfaction of the remaining balance at the end of the bankruptcy process.  (Fee Hr'g Tr.
vol. 2, 82, 144-145, Nov. 29, 2007).

Simpson testified that when he approached BEGS for the payment of the
prepetition fees, Windels was owed $267,427.86 for services rendered to BEGS for its
investment in the Source Entities and approximately $200,000 for services rendered to
the Source Entities.  He claims that the $275,000 check satisfied only BEGS's
obligations to Windels and that Windels "waived" the portion of the $200,000 that
Enterprises owed the firm.  (Fee Hr'g Tr. vol. 1, 28-29, 60-62, Nov. 28, 2007; Fee Hr'g
Tr. vol. 2, 42-43, Nov. 29, 2007).  Simpson contends that BEGS knew that (i) the
$275,000 went to satisfy only BEGS's obligation to Windels for work related to its
investment in the Source Entities as opposed to work performed for the Source Entities,
and (ii) Simpson was waiving any amount due from Enterprises.  After weighing the
testimony at the Fee Hearing, however, the Court finds Simpson's contentions are not
credible.

The Court finds that BEGS's issuance of the $275,000 check to Windels on August 21, 2006 was intended by BEGS to be a payment toward the combined obligation of $480,000 and that the amount due Windels from Enterprises was to be satisfied from such payment.[13]  Additionally, the Court finds that Simpson never advised BEGS, J. Scott, Williams, Enterprises or his own firm that any portion of the balance was "waived" (written off), or that thereafter the remaining balance owed by non-debtor subsidiaries would be "waived" (written off) in the event they were to file for bankruptcy protection.

While Windels's accounting records establish that Windels applied the $275,000 check to satisfy $267,427.86 due for the firm's representation of BEGS and the balance remained as a credit, those same records do not support Windels's contention that at the time it sought to be retained amounts due from Enterprises were waived.  There is no evidence that Windels wrote off any amount due from Enterprises or that such write off was communicated to anyone, until the issue was raised by the UST's attorney.  Only he (the UST's attorney) was told of the alleged write off.

Windels acknowledges that the firm's books did not indicate a write off with respect to those amounts until after issue was raised in November 2007.  (Fee Hr'g Tr. vol. 2, 67-69, Nov. 29, 2007.)  Elizabeth Colon ("Colon"), Windels's Billing Coordinator, testified that in order to reduce a bill she would normally get instructions to

---

[13] BEGS did not reflect Source-related legal fees in its books and records until they were approved by Williams or J. Scott.  (Fee Hr'g Tr. vol. 3, 56-57, 172, Dec. 10, 2007.)  J. Scott described his "batch process" management style with respect to Windels's bills.  It appears that such bills were accumulated and later recorded as liabilities only to the extent such bills were paid, with any remaining amounts not reflected at all.  This system for reporting Source-related liabilities does not provide an accurate reflection of BEGS's liabilities.

write off time.  (Fee Hr'g Tr. vol. 2, 66-67, Nov. 29, 2007.)  She received no such

instruction regarding the Debtor until after the issue was raised in connection with the

instant motion.  Shortly before the first day of the Fee Hearing, the amounts owed to

Windels by Enterprises still appeared on the firm's books. (Fee Hr'g Tr. vol. 2, 63-64,

Ex. W-10, Nov. 28, 2007).

Simpson points to two things as evidence of a write off: (i) his conversation with

the UST's attorney during a review of the Retention Application and 2014 Affidavit,[14]

and (ii) Windels's intention to not pursue recovery of the Enterprises fees.  (Fee Hr'g Tr.

vol. 2, 42, Nov. 29, 2007).

Simpson asserts that in response to a question by the UST's attorney whether

Windels was owed any amounts from Enterprises or BEGS, Simpson told him that

Windels had written off the Enterprises fees and that BEGS did not owe Windels any

fees.  Simpson contends that he was prepared to amend the Retention Application and

2014 Affidavit to disclose these facts but that the UST's attorney told him it was not

necessary.  (Fee Hr'g Tr. vol. 1, 28-29, Nov. 28, 2007.)  The UST's attorney does not

dispute this conversation.

Windels's assertion that it never intended to pursue recovery of its fees from

Enterprises contradicts the Entertainment Proof of Claim which contained invoices

seeking prepetition fees attributable to Enterprises.  Windels's later amendment to extract

those amounts was done only after objection was raised.  Simpson's notation in the

---

[14] The record does not indicate the date of the conversation with the UST's attorney, but it was
sometime after the September 25, 2006 filing of the Retention Application.

amendment, "[p]lease be advised that the original proof of claim is amended to the extent that inadvertently included therein were fees for prepetition services rendered on behalf of [Enterprises], payment of which was previously remitted to [Windels] . . . by Enterprises," is inconsistent with his testimony throughout this case that Windels never received any money at all from Enterprises in satisfaction of any Enterprises's debt.  (Fee Hr'g Tr. vol. 2, Ex. BEGS-3, Nov. 29, 2007; Fee Hr'g Tr. vol. 1, 67-68, Nov. 28, 2007.)[15]  Simpson's assertion that he did not review the notation before he signed the amendment, even if accurate, is nonetheless another example of Windels's careless representation.

The Court finds that this is not a situation in which there was a simple failure by an attorney to communicate a write off to his firm's accounting department and the firm then erroneously including the amount in a proof of claim.  Simpson not only failed to communicate the alleged write off to Windels, he failed to communicate it to his client, Enterprises, as well as to BEGS, the would-be payor of such obligation.  Testimony at the hearing established that the parties intended to revisit the issue of the balance remaining after BEGS's $275,000 payment.  And while Simpson knew that Windels could not collect prepetition fees from the Debtor, it was to Windels's advantage to maintain a higher outstanding balance which it could use in any negotiation that would take place at the end of the bankruptcy process or at the time the affiliates would be filed.  The alleged written-off amount, therefore, continued to have economic value for Windels.

---

[15] While Simpson signed the amended Entertainment Proof of Claim, he later distanced himself from the notation stating: "This is not my Note 1.  I signed the first page . . . gave instruction that a note be added to this explaining the difference between the original proof of claim and the amended proof of claim . . . I just saw [the note] within the last thirty days."  (Fee Hr'g Tr. vol. 1, 68, Nov. 28, 2007).

In sum, the Court finds that the parties were in agreement that any further payment to Windels – whether to satisfy the remainder due on the combined obligation or to pay legal fees that Windels would incur as bankruptcy counsel, would be considered at the conclusion of the bankruptcy case. The parties were operating under the assumption that the case would proceed relatively quickly. (Fee Hr'g Tr. vol. 2, 124, Nov. 29, 2007) (Miller: "[Simpson] responded by stating that he understood at one point he had agreed to defer payment till the end of the case but he didn't realize that the case was going to take this long."); (Fee Hr'g Tr. vol. 2, 83, Nov. 29, 2007) (J. Scott: "Simpson said . . . that the normal process in a bankruptcy is that the professionals bill approximately every ninety days or so, but I will only give you a bill at the end of the case. . . . I will bill when this is completed. . . . [T]hat was our understanding . . . . As part of us making that $275,000 payment, we would not have to make another payment to [Windels] until the end of the bankruptcy proceeding.").

Whatever the reason for not writing off the amount, the result was that Windels remained a creditor and the record supports a finding that such failure was not a mere oversight or accounting error. Based upon all of the above, Windels, as a creditor of Enterprises, held an interest adverse to the estate, was not disinterested and, therefore, was not qualified to serve as bankruptcy counsel in this case.

### B.  Windels was a creditor of at least one non-debtor affiliate

Windels was also a creditor of at least one of Enterprises's non-debtor affiliates. As of the Involuntary Petition Date, Entertainment owed Windels $116,550.43 – a fact not disclosed in the Retention Application, the 2014 Affidavit or in Simpson's discussion with the UST's attorney. Rather, after Windels withdrew as counsel for Enterprises and

after Entertainment filed a chapter 11 petition, Windels submitted the Entertainment

Proof of Claim seeking legal fees in the amount of $185,038.89.[16]  (Fee Hr'g Tr. vol. 2,

Ex. BEGS-2, Nov. 29, 2007.)  Given the statement in the Retention Application that the

Debtor would "seek chapter 11 case protection for" its subsidiaries and affiliates, the fact

that money was owed to Windels by at least one such party was clearly pertinent to its

retention and should have been disclosed.  In order to carry out the Debtor's stated

intention, Windels would have to have been paid the amount owed by such affiliates or

written off such amounts.

### C.  Windels did not disclose relevant connections

Windels's Retention Application disclosed that Windels had previously

represented BEGS and the various Source entities but that Windels (1) "does not: (i) hold

or represent an interest adverse to the Debtor's estate; (ii) have any connection with the

Debtor, any of its creditors or parties in interest . . . except as set forth above;" and (2) "is

a 'disinterested person' . . . with respect to the Debtor and its estate."  (Ret. Appl. ¶¶ 14-

15.)  The 2014 Affidavit Simpson submitted in support of the Retention Application

stated that "neither [Windels], nor I: (i) hold or represent . . . any interest adverse to the

estate; (ii) have any connection with the Debtor, any of its creditors or parties-in-interest"

and Windels "has not received any payment from the Debtor nor from any other source in

connection with [Windels's] retention in the instant chapter 11 case."  (2014 Aff. ¶¶ 4-5).

---

[16] As set forth above, the Entertainment Proof of Claim included $68,488.46 in fees owed by
Enterprises – amounts Windels has, at times, described as having been "waived," (Fee Hr'g Tr. vol. 2, 42-
43, Nov. 29, 2007), "previously remitted," (Am. Entertainment Proof of Claim 2) and "never" paid.  (Fee
Hr'g Tr. vol. 1, 27, Nov. 28, 2007).

There was no disclosure that Enterprises owed Windels any amount or that any amount had been written off.  There was no disclosure that Entertainment owed Windels any amount or that Windels would write off such amount in the event Entertainment filed a bankruptcy petition.  Because of the likelihood, as stated by Windels, that the non-debtor affiliates would file bankruptcy petitions, disclosure of Windels's creditor status, among other things, was unquestionably required.  Nor was there disclosure that Windels had just received a check for $275,000 from BEGS, a preferred shareholder of Enterprises and Entertainment, the intended DIP Lender, and the sole source of funding for the Debtor going forward.  Finally, there was no disclosure that Windels had agreed with BEGS to defer payment of Windels's legal fees until the end of the bankruptcy case.

Despite this absence of relevant information, Windels insists that it met all disclosure requirements.  With respect to the prepetition amounts Enterprises owed, Simpson contends that there was no need for disclosure "[b]ecause whatever they were, they were waived and neither [Windels] nor I were ever going to seek to collect any money, other than through an application to the bankruptcy court for services rendered to [Enterprises] post petition.  And when I spoke to [the UST] and responded to his inquiry and offered to revise and include those amounts in the application, I was told it wasn't necessary, so that I didn't."  (Fee Hr'g Tr. vol. 2, 42, Nov. 29, 2007.)  With respect to Entertainment, Windels asserts it had no obligation to disclose its creditor status because Entertainment was a separate legal entity from Enterprises.  (Fee Hr'g Tr. vol. 3, 212, Dec. 10, 2007.)  Further, Simpson asserts that if Entertainment ever filed for bankruptcy, Windels would have, at that time, written off any amounts Entertainment owed. (Fee

27

Hr'g Tr. vol. 2, 33, Nov. 29, 2007.)  And with respect to BEGS, Simpson argues that the

$275,000 payment did not need to be disclosed "[b]ecause . . . it was a payment by a

third-party non-debtor for services rendered exclusively and solely for that third party

prepetition and in no way involved [Enterprises], the debtor."  (Fee Hr'g Tr. vol. 2, 42,

Nov. 29, 2007).

   The Court notes that the view of the UST's attorney as to the necessity of a

revision is of no consequence under the circumstances presented here.[17]  Moreover,

Windels's disclosure to the UST's attorney was neither accurate nor complete.  Windels

did not reference the amount BEGS had paid to Windels or the pervasiveness of their role

in the Source Entities.  Windels did not reference the amounts Windels was owed by the

non-debtor entities – entities that Windels asserted were likely to become debtors and

amounts that would have to have been paid by BEGS or written off.  Even if one could

argue that Windels acted in good faith by its willingness to amend its disclosure or that

any sanction should be reduced because it relied upon the statement of the UST's

attorney in not amending its 2014 Affidavit, the disclosure made to the UST's attorney

was inaccurate and incomplete and, therefore, no such consideration is warranted.

   Prior to seeking retention, Windels's relationship with BEGS on the issue of

outstanding fees was, at best, strained.  Having decided to proceed with the retention,

given Windels's knowledge of the players and their interconnected relationships, as well

---

[17] The fact that the UST's attorney asked Simpson about Windels's prior representation of BEGS and Enterprises highlighted the fact that these were subjects requiring disclosure.  The UST's satisfaction with Simpson's answer about these subjects did not excuse Simpson from his obligation under Bankruptcy Rule 2014 to disclose them, even so given the fact that Simpson's answers to the queries posed by the UST's attorney were inaccurate and incomplete.

as of Windels's dependence upon BEGS to pays its fees with respect to both Enterprises

and the non-debtor entities, full and complete disclosure, including details sufficient to

clarify the interconnected relationships and dependencies of which Windels was aware,

was mandated.  Windels instead chose to make incomplete disclosures and proceeded to

spend much of its tenure as bankruptcy counsel creating or preserving opportunities for

obtaining payment, all such efforts in contravention of its deferral agreement and often in

conflict with its professional obligations.

### D.  Windels's ethical breach

Not only was Windels not disinterested and failed to make appropriate disclosure,

it breached ethical, professional obligations in its representation of the Debtor.[18]

For example, on October 19, 2006 Windels filed the Debtor's Original Plan and

Disclosure Statement setting forth the generally contemplated restructuring.  Windels

seeks fees and expenses in the amount of $71,108.40 related to its work on these

documents.  (Am. Fee Appl., Ex. D at 236.)  Yet Simpson claims that the Debtor's board,

acting on behalf of BEGS and not the Debtor, was in control of the decision making with

respect to the Original Plan and Disclosure Statement.  (Am. Fee Appl. ¶¶ 36-38.)

Simpson claims that the Debtor's board, in particular J. Scott, forced him to file the

---

[18] The question of whether Windels breached attorney-client privilege is not addressed in this opinion.  A breach has been alleged, for example, with respect to Windels's assertion that: "[Windels], through knowledge gleaned while serving as counsel in Enterprises's chapter 11 case . . . and from representations made to it by . . . Jeremy Miller, President and CEO of the Debtors and Michael Feinberg, Controller of the Debtors, contends that BEGS has dictated, manipulated and controlled the submissions and representations made by the Debtors to the Court throughout these proceedings in an attempt to devalue the Debtors and acquire the Debtors for itself at minimal cost."  (Windels Obj. to Discl. Stmnt. with respect to Second Am. Plan ¶ 12; Windels Obj. with respect to Fourth Am. Plan ¶ 12.)  Simpson distanced his firm from these assertions at the Confirmation Hearing, asking that the Court ignore them for purposes of confirmation.  (Confirmation Hr'g Tr. vol. 1, 5-6, Sept. 27, 2007, vol. 2, 95-99, Sept. 28, 2007).

Original Plan and Disclosure Statement which Simpson did, despite his personal belief at the time that BEGS was improperly controlling the Debtor and that, in failing to provide a recovery to unsecured creditors, among other things, the Original Plan and Disclosure Statement represented a derogation of the Debtor's fiduciary duties.  (Am. Fee Appl. ¶ 37; Fee Hr'g Tr. vol. 2, 34-36, Nov. 29, 2007).

The Court does not agree with Simpson that the Original Plan and Disclosure Statement represented a breach by the Debtor of its fiduciary duties.  Textron's secured claim far exceeded any realistic estimate of value of the Debtor's assets and, as such, it was not a breach of the Debtor's fiduciary duties to propose a plan that provided no distribution to unsecured creditors.  The fact that such treatment would give rise to opposition from unsecured creditors does not equate to a breach of fiduciary duty.  Further, BEGS's receipt of equity, under the Original Plan and Disclosure Statement, in return for its $3 million contribution as a DIP Lender was not *per se* unwarranted under the circumstances.[19]

The issue of concern here is not whether the Original Plan and Disclosure Statement represented a breach of the Debtor's fiduciary duties but, rather, whether Simpson's filing of the documents on behalf of the Debtor, while believing at that time that the Debtor was improperly controlled and breaching its fiduciary duties, was a breach of Simpson's, thereby Windels's, ethical, professional obligations.

---

[19] Simpson himself noted that the Original Plan was not an impossibility.  At the 341 Meeting, in response to a creditor's inquiry as to how a plan providing no distribution to unsecured creditors could be confirmed, he stated "cram it down their throat."  (341 Mt'g Tr. 60:22, Nov. 3, 2006.)  At the Fee Hearing, Simpson stated that even a no-distribution plan was beneficial to the estate because it was part of the "plan formulation process."  (Fee Hr'g Tr. vol. 1, 44-46, Nov. 28, 2007).

Windels was obligated to advise the Debtor of, among other things, its fiduciary duties as well as of his view that BEGS's control was putting the Debtor in breach of such duties. Canon 7 of the New York Lawyer's Code of Professional Responsibility provides that "a lawyer should represent a client zealously within the bounds of the law." N.Y. Code of Prof'l Responsibility Canon 7, EC 7-1 (2008). In furtherance thereof, DR 7-101(B)(2) explains that zealous representation includes "[r]efus[ing] to aid or participate in conduct the lawyer believes to be unlawful, even though there is some support for an argument that the conduct is legal." N.Y. Code of Prof'l Responsibility, 22 NYCRR §1200.32 (2008). Similarly, DR 7-102 (A)(2) and (7) provides that "a lawyer shall not . . . knowingly advance a claim that is unwarranted under existing law . . . or . . . counsel or assist the client in conduct that the lawyer knows to be illegal or fraudulent." N.Y. Code of Prof'l Responsibility, 22 NYCRR §1200.33 (2008).

Zealous representation means that a lawyer must use its best efforts to, among other things, (i) ensure that a client's decisions are made only after the client has been informed of relevant considerations; (ii) verify only those pleadings the lawyer believes are in compliance with applicable law and rules; (iii) not assert frivolous positions; and (iv) not knowingly assist a client in taking a frivolous legal position. N.Y. Code of Prof'l Responsibility Canon 7, EC 7-8, 7-1, 7-4 and 7-5 (2008).

Since Simpson believed that the Original Plan and Disclosure Statement were inaccurate or unlawful and he was unable to convince the Debtor of his concerns or to take an alternate course of action, Windels was obligated to seek to withdraw as counsel at that time. Ethical rules provide that a lawyer may withdraw if a client insists upon presenting a claim or defense that is not warranted under existing law or if the client "by

31

other conduct renders it unreasonably difficult for the lawyer to carry out employment

effectively." N.Y. Code of Prof'l Responsibility, 22 NYCRR §1200.15 (2008). *See also*

*In re Perez*, 30 F.3d 1209, 1219 (9th Cir. 1994) (if a lawyer "develops material doubts

about whether a proposed course of action in fact serves the estate's interest, he must

seek to persuade his client to take a different course or, failing that, resign").

Moreover, given the seriousness of his concerns regarding BEGS's control, as a

fiduciary of the estate, Simpson should have brought his concerns to the attention of the

Court. *See, e.g., In re Food Mgmt. Group, LLC,* 380 B.R. 677, 708 (Bankr. S.D.N.Y.

2008) ("`While counsel's duty to the estate may not rise to the level of a policeman for

the debtor's post-petition conduct, an attorney for the debtor in possession has fiduciary

obligations to the estate stemming from his fiduciary obligations to the debtor in

possession and his responsibilities as an officer of the court.'. . . [T]he attorney 'cannot

simply close his or her eyes to matters having an adverse legal and practical consequence

for the estate and creditors'" (internal citations omitted)); *In re JLM, Inc*., 210 B.R. 19,

26 (B.A.P. 2d Cir. 1997) ("[B]ecause counsel for the debtor in possession has fiduciary

obligations not ordinarily foisted upon the attorney-client relationship, the attorney for

the debtor in possession may not simply resign where the client refuses the attorney's

advice concerning the client's fiduciary obligations to the estate and creditors. Counsel

must do more, informing the court in some manner of derogation by the debtor in

possession."); *In re Wilde Horse Enter., Inc*., 136 B.R. 830, 847 (Bankr. C.D. Cal. 1991)

("[O]n the very first hint or suspicion that the debtor or debtor's principal is not being

honest, or is neglecting his/hers/its fiduciary duty to the estate, it is the attorney's duty to

first ask *probing* questions and *demand full and reasonably corroborated responses*, and

then if counsel is still unsatisfied or ethically uncomfortable, immediately bring the

unresolved concerns to the Court's attention by way of a motion to be relieved as counsel

of record or in some other way.  The wholly unacceptable response is to do nothing and

continue in the engagement 'looking the other way.'  Counsel does so at his or her

personal and professional peril.") (emphasis in original).

Instead, Simpson acquiesced in the alleged "forced" filing of the Original Plan

and Disclosure Statement and did not seek, at that time, to withdraw as counsel or to

otherwise make the Court aware of his concerns.  Simpson's continued representation of

the Debtor under this strained relationship was at odds with his ethical obligations and

was detrimental to the estate.  Rather than seeking to rectify his concerns regarding the

Debtor, Simpson turned his efforts to securing an avenue for getting his firm's legal fees

paid despite having agreed to defer them.

### 1. The Interim Comp Motion

On October 23, 2006, the Committee filed the Interim Comp Motion seeking to

establish a protocol for compensating professionals on a monthly basis.  Simpson failed

to represent the estate in connection with this motion in an attempt to secure an avenue

by which to seek payment for his firm's legal fees.

The Committee brought the Interim Comp Motion "in light of the fact that the

professional fee 'carve out' was only $500,000 in connection with the proposed [DIP]

financing" and "to make sure that fees did not mount without an ability to have them

paid."  (Califano Aff. ¶ 2.)  At the hearing, the Court noted that a motion seeking interim

compensation is typically brought by a debtor and requires a representation that the

debtor has the financial wherewithal to make such payments.  The Court asked the

33

Windels associate what the Debtor's position was with respect to its wherewithal to pay

the professional's monthly fees without jeopardizing its cash obligations or cash flow.

Unknown to the Court was the fact that Windels had never, despite numerous

opportunities to do so, properly advised the Debtor about the motion nor received

authorization to take a position on the Debtor's behalf.[20]  Despite this, Simpson sent an

associate to the hearing who, when queried by the Court as to the Debtor's wherewithal

to meet the proposed monthly obligation, stated "there is half a million dollar 'carve out'

for administrative expenses and that would be the funds – the cash that would provide

administrative creditors the money to pay the fees and expenses."  (Fee Hr'g Tr. vol. 3,

Ex. BEGS-5 at 4-5, Dec. 10, 2007.)  Even though the Court found the associate's

reference to the application of the carve out perplexing,[21] the Court assumed that the

associate was simply unfamiliar with the mechanics of the carve out.  However, what was

clear was that the Debtor was appearing by counsel at that hearing, represented that it had

the wherewithal to make the payments and did not object to the relief sought.  The

relevant issue is not whether the attorney's representation as to the source of payments

was correct but that a representation was made on behalf of the Debtor that was not

_____

[20] "Q: Did [Windels] receive authorization from the debtor to support that application?  A: We didn't receive any directions from the debtor with respect to that application." (Fee Hr'g Tr. vol. 1, 90, Nov. 28, 2007); "We've never gotten any instructions.  I directed [my associate] to appear so that the [D]ebtor would be present at the hearing but we had no instructions one way or the other." (Fee Hr'g Tr. vol. 1, 94, Nov. 28, 2007).

[21] A "carve out" in a DIP Agreement is not typically used for paying ongoing expenses but rather is to ensure professionals get paid in the event of a default and liquidation.  Simpson appears to have understood this.  (Fee Hr'g Tr. vol. 1, Ex. BEGS-10, Nov. 28, 2007.)  However, at the Fee Hearing Simpson distanced himself from this understanding stating that this was the first case that he was involved in where there was a "carve out."  (Fee Hr'g Tr. vol. 3, 203, Dec. 10, 2007.)

authorized.  The Court was misled into believing that the Debtor supported the relief.

Windels did not inform the Court that it had not discussed the motion with, and was not authorized by, the Debtor to take a position.[22]  Nor did Windels request that the firm be excluded from the effect of the Interim Comp Order, if granted, given Windels's agreement to defer payment.  Upon no objection and the apparent support of the Debtor, the Court granted the Interim Comp Motion obligating the Debtor to pay professionals, including Windels, upon the submission of a monthly fee statement and a 20-day objection period.  Based upon its agreement with BEGS to defer fees to the end of the case, Windels knew it could not have brought the Interim Comp Motion for its own benefit and that the Debtor might resist paying Windels based upon the deferral agreement.  By not advising its client, and not disclosing this to the Court, Windels was able to use the Interim Comp Order to try to override its agreement to defer compensation.

### 2. *Withdrawal*

Williams testified that BEGS received a fee statement from Windels seeking fees in accordance with the Interim Comp Order.  Williams understood from J. Scott that Simpson was threatening to resign if the fee statement was not paid.  (Fee Hr'g Tr. vol. 2, 85-86, Nov. 29, 2007.)  Williams and J. Scott met with Simpson and reminded him of the deferral agreement.  Williams stated that Simpson acknowledged the deferral agreement

---

[22] It does not appear to the Court that the associate knew that Simpson had neither discussed the motion with the Debtor nor had been authorized to take a position.  The Court notes that Simpson had ample opportunity to discuss the Interim Comp Motion with the Debtor between the date the motion was filed and the date of the hearing on the motion.  (Fee Hr'g Tr. vol. 3, 189-190, Dec. 10, 2007.)

but pointed to the Interim Comp Order as evidence of the Court mandating that BEGS pay Windels.  Williams asked why they had not been previously made aware of the Interim Comp Motion and Simpson told them it was because BEGS was not Windels' client and that Simpson therefore had no obligation to them.  (Fee Hr'g Tr. vol 2, 85-86, Nov. 29, 2007).

The Court finds that at this point the issue of getting paid had degenerated into a highly personal one, as evidenced by Williams's testimony regarding the conclusion of the meeting, the agreement to pay Windels $50,000 toward the fee statement and Windels's subsequent resignation.  (Fee Hr'g Tr. vol 2, 86-90).

Having not been paid in accordance with the Interim Comp Order, on January 12, 2007, without prior notice to the Debtor, Windels filed a motion to withdraw as counsel. Simpson stated as cause for withdrawal: "[T]he Debtor, at the direction of its Board of Directors, which Board . . . is controlled by [BEGS], the provider of the . . . DIP Credit Facility, has refused to remit payment to [Windels] for legal services rendered to Debtor by [Windels] in accordance with [the Interim Comp Order]."  (Withdrawal Appl. ¶ 16.) The Withdrawal Motion was unopposed and the Court approved it unaware that Simpson (i) had not advised the Debtor with respect to the Interim Comp Motion and had taken an unauthorized position with respect thereto and (ii) that additional "cause" existed.[23] Given the Court's finding that the parties had an agreement to defer payment to Windels

---

[23] Simpson asserts that additional cause existed which was not set forth in the Withdrawal Motion, namely, his "increasing discomfort that [J. Scott] was directing the bankruptcy of Enterprises in a manner that was designed to solely benefit the DIP Lender, [BEGS], to the detriment of the Debtor and its creditors, in direct violation of the Debtor's fiduciary duties." (Windels's Resp. to Supp. Obj. ¶ 33).

until the end of the case, the Interim Comp Order did not apply to Windels.  As such, the

Debtor's (or BEGS's) failure to comply with such order was not sufficient cause for

Windels's withdrawal.

Critical time was wasted between October 19, 2006 (the date on which Windels

filed the Original Plan and Disclosure Statement believing the Debtor to be improperly

controlled and in breach of its fiduciary duties) and January 12, 2007 (the date on which

Windels sought to withdraw as bankruptcy counsel).  Windels being at odds with its

client during this period resulted in administrative standstill and damage to the estate.

For example, Windels accomplished nothing during that time with respect to the

non-debtor affiliates.  Despite the recognition that any restructuring of the Source, which

Textron would support, would necessarily require bringing the relevant non-debtor

affiliates into the case, (Fee Hr'g Tr. vol. 2, 29-33, 119-121, Nov. 29, 2007; Fee Hr'g Tr.

vol. 3, 34-37, Dec. 10, 2007), Simpson avoided doing so.  Simpson suggests that it was

BEGS and not Windels, that prevented the affiliates from being included in the

bankruptcy (Fee Hr'g Tr. vol 3, Ex. W-22, Dec. 10, 2007.)  Regardless of whose idea it

was not to include the affiliates in the bankruptcy at that time, the Court finds it equally

compelling, given the strained atmosphere, that Windels avoided the inclusion of the

affiliates because Windels was a creditor of at least one of them - Entertainment.

Windels knew it could not approach BEGS to pay the balance remaining after the

$275,000 payment in August and Windels was not willing, at that time, to write off that

obligation.  As discussed previously, Windels never disclosed this clear conflict.

Following withdrawal, Windels aggressively pursued the payment of its legal

fees.  Windels filed, among other pleadings, adversary proceedings against BEGS and the

37

Source Entities, proofs of claim and a motion to compel payment.  Windels also objected

to the Disclosure Statement and to confirmation of the Plan.  Windels appealed the

Confirmation Order, which appeal is currently pending before the District Court in the

Southern District of New York.  Despite having asserted throughout its tenure as counsel

to Enterprises that the Source Entities were, for all practical purposes, one entity, and that

the asset value of the Source Entities was held by Enterprises,[24]  Windels's appeal,

consistent with its position at Confirmation, disputes the substantive consolidation of the

Source Entities arguing that they are separate and distinct entities with unique assets and

creditors.  (Appellant's Br. 5-11).

## IV.  CONCLUSION

Considering all of these circumstances, including, the Bankruptcy Code's strict

prohibitions concerning conflicts, Windels's creditor status with respect to the Debtor

and other adverse interests held at the time it sought to be retained, the Bankruptcy

Rule's disclosure requirements, the mandates of professional responsibility, and the

manner in which Windels withdrew from this case, the Court concludes that a denial of

all compensation sought is appropriate.  The manner in which Windels represented the

Debtor and the firm's eventual singular concentration on fees, as opposed to its role as

counsel, caused harm to the Debtor sufficient to support a denial of all fees sought.[25]

---

[24] (*See, e.g.*, Ret. Appl. ¶¶ 10-11; Orig. Discl. Stmnt. 34; Enterpr.'s Pet. Schedules B, G; 341 Mt'g Tr. 67:4-14, Nov. 3, 2006).

[25] Whatever may have been done by Windels to advance the interests of the estate was countered by, among other things, the stagnation of the case that resulted from the manner in which issues related to fees and withdrawal were handled.

Windels is therefore not entitled to any fees and is directed to disgorge the $50,000 payment previously received with respect to its fees.[26]

The Court is inclined to allow the reimbursement of actual, necessary expenses incurred by Windels between the Retention Date and the Withdrawal Date.  However, the Amended Fee Application fails to provide sufficient information by which to make such determination.  Windels request for reimbursement of expenses in the amount of $31,175.09 is therefore denied, subject to further submission by Windels of a supplemental application identifying the relevant expenses in a manner sufficient for the Court to determine their allowability under section 330 of the Bankruptcy Code.

The reorganized debtors should settle an order consistent with this opinion.

**s/Arthur J. Gonzalez**
UNITED STATES BANKRUPTCY JUDGE

New York, New York
March 27, 2008

---

[26] The $50,000 disgorgement is to be paid by Windels to Curtis Mallet who is directed to hold such amount in escrow pending the Court's allowance, if any, of expenses resubmitted for consideration as set forth herein.  In the event expense reimbursement is allowed, the escrow shall be reduced by such allowed amount and paid to Windels.  The remaining escrow balance may then be paid to the reorganized debtors.